IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  07-cv-02013-WYD-KMT

MICHELLE ESTRADA,

      Plaintiff,

v.

FIRST TRANSIT, INC.,

      Defendant.

---

## ORDER DENYING SUMMARY JUDGMENT

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant First Transit, Inc.'s Motion for Summary Judgment and Memorandum in Support of its Motion for Summary Judgment (filed June 16, 2008).  The claims in this case relate to Plaintiff Michelle Estrada's ["Plaintiff" or "Estrada"] employment with First Transit, Inc. ["First Transit"] and her subsequent resignation.  Plaintiff asserts claims of sexual harassment - *quid pro quo* and hostile work environment, outrageous conduct and negligent employment and supervision.

Estrada's claims relate to the alleged sexual harassment perpetrated by her supervisor, William Hyche ["Hyche"].  She asserts that this harassment occurred both during her employment with First Transit and even after she left First Transit.  Hyche

was dismissed as a defendant from this case by Order of September 29, 2008, pursuant to a joint stipulated motion to dismiss filed by the parties.

II.    FACTUAL BACKGROUND

I first note that voluminous facts have been asserted by both parties in connection with the summary judgment motion and briefing.  I have stated those facts which I deem pertinent to my ruling.  I have, however, construed all of the facts in the light most favorable to Plaintiff as I must for purposes of this summary judgment motion.  *See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008).[1]

A.    Estrada's Employment History

It is undisputed that First Transit is a private transportation company currently a party to a contract with Denver Regional Transit District ["RTD"] in Denver.  Pursuant to that contract, First Transit provides operations to RTD's fixed route services in the Denver metro area.  The Denver location of First Transit employs a General Manager, Operations Manager, Safety Manager, Training Manager, Human Resources Manager, dispatchers, supervisors, bus drivers/operators, and administrative and maintenance staff.

On May 2, 2005, Plaintiff began her employment with First Transit.  Initially, she held the positions of dispatcher and driver.  Plaintiff estimates that she worked about 70% of the time as a dispatcher and 40% of the time as a driver.  Plaintiff's goal was to begin employment as a dispatcher and then be promoted into scheduling.

---

[1]  I also note that I have cited to the record only where the facts are disputed.

As a dispatcher, Plaintiff had an office inside the building where drivers arrived to sign up. She was responsible for checking drivers in and verifying that each driver had his or her relevant supplies for the routes. She was also responsible for making sure the drivers were dressed properly and confirming they were not under the influence of alcohol. If drivers needed anything during their routes, they contacted Plaintiff and at times she sent a supervisor out to the drivers. When she worked as a dispatcher, Plaintiff worked from 2:00 p.m. until 11:00 p.m. Her supervisor, William Hyche ["Hyche"], worked 7:00 a.m. until 5:00 p.m.

At the end of August or the beginning of September 2005, Estrada switched positions and became a scheduler. She remained in this role for approximately three and a half months. As a scheduler, Plaintiff assigned drivers to various routes. Additionally, she handled the drivers' DOT hours, vacation and days-off requests according to Company policy. Plaintiff's hours as a scheduler were from 7:00 a.m. to 4:00 p.m. At times, she also worked 5:00 a.m. to 4:00 p.m.

Around Thanksgiving of 2005, Plaintiff requested that Hyche remove her from scheduling. Her request was granted and in December 2005, she was transferred to the position of street supervisor. Plaintiff testified that she did not ask for a street supervisor position. (Ex. 1 to Pl. Michelle Estrada's Mem. in Supp. of Her Resp. in Opp. to Def. First Transit's Mot. for Summ. J. ["Pl.'s Resp."] at 58.) Plaintiff held this role for the last six months she was employed at First Transit.

As a street supervisor, Plaintiff was responsible for driving various RTD routes and dealing with customer needs that could not be handled by drivers. This work was

not performed at the company's location but out on the bus routes.  Plaintiff testified that she preferred being a street supervisor over being a dispatcher because she was out of the office, away from everybody.  (Ex. A to Def. First Transit, Inc.'s Mem. in Supp. of its Mot. for Summ. J. ["Def.'s Mem."] at 80.)  Further, she liked the job.  (*Id.*)  It also appears that the pay for both jobs was the same.

As a street supervisor, Plaintiff did not have to report in to Hyche when she began her shift in the morning.  While employed at First Transit, Estrada was paid $15 per hour for all of her positions.

Plaintiff asserts that the move from scheduler to street supervisor is a demotion in the First Transit strata of job positions.  She offered no support for that assertion. While First Transit asserts that nothing in the record supports the allegation that this was a demotion,  Roger Chapin ["Chapin"], the General Manager, testified in his deposition that while the jobs of dispatcher and street supervisor were equal, Plaintiff received a demotion when she was taken out of the scheduling position.  (Ex. 6 to Pl.'s Resp. at 34.)  He also testified that Estrada was given the street supervisor position in response to concerns about favoritism in terms of assignments.  (*Id.*)

Plaintiff testified that her shifts as a street supervisor were for eight hours.  (Ex. 1 to Pl.'s Resp. at 69.)  At first, her shifts were a set schedule from noon to 8:00 for a couple of weeks and then she became a floater, when she covered days off of other supervisors.  (*Id.* at 69-70.)  She also testified that she believed her rebuff of Hyche, described below, caused a change in her schedule.  (*Id.* at 344.)

Plaintiff acknowledged receiving an Employee Handbook ["Handbook"] from First Transit. Among other things, the Handbook provides that "[d]iscriminatory harassment of employees, whether by managers or coworkers, will not be tolerated." Additionally, the Handbook states: "[i]f a personal problem is affecting your work, feel free to discuss it, in confidence, with your supervisor, manager, or Region Vice President." The Handbook also describes a Redress Procedure in which complaints are encouraged to be reported. It recognizes that occasionally there are "employee dissatisfactions", and states, "We would like to have the opportunity to seek out the most fair and equitable solution…[however,] [w]e can only do so if we are aware a situation exists. So, if you have complaints, tell us about them." (*Id.*) Additionally, the Handbook states that the "First Transit Human Resources department is available to consult with you." That reporting policy allows employees to have another employee present at every stage of their complaint, if desired.

Paragraph 9.01 of the Handbook is entitled "Prohibition of Harassment." It reads in pertinent part:

> First Transit is committed to maintaining an atmosphere that is free of conduct considered to be harassing or abusive. Any form of harassment is prohibited. First Transit recognizes that discrimination of any type undermines the integrity of the employment relationship between employer and employee. Discrimination is absolutely inconsistent with the philosophy of the firm and with sound management practice. Any individual, whether applicant or employee, who believes that he or she has been subjected to any from [sic] of harassment, should immediately notify his or her manager or Human Resources representative of the alleged complaint. In all cases, reasonable measures will be taken to protect the complaining employees from retaliatory, harassing, or abusive behavior. All complaints are taken seriously and will be investigated promptly. Conduct by any employee that results in discriminatory harassment against other employee(s), of a sexual nature or any other form of

harassment, is improper and will result in corrective disciplinary action, including possible termination.

Estrada admitted that she was aware of the Company's harassment policy and was aware of her responsibilities under the policy.

First Transit's Open Door policy states that each employee is offered the "opportunity to speak up and be heard on matters that they consider important."  That policy also provides: "We also realize that things go wrong occasionally for all of us…If a personal problem is affecting your work, feel free to discuss it, in confidence, with your supervisor, manager or region vice president."

At the commencement of her employment, Estrada signed an Acknowledgment that she received and familiarized herself with the Company's Open Door Policy and its Harassment Free Workplace policy.  (Ex. A to Def.'s Memo. at 102; Ex. A-1, Dep. Ex. 5.)  Estrada testified, however, that she was not familiar with the contents of either policy and did not remember its contents.  (*Id.*)  She acknowledges that she had heard First Transit had an open door policy, but testified that Roger Chapin, the General Manager, did not practice that policy.  (*Id.* at 187-88.)  Estrada also signed an Acknowledgment that she read First Transit's Sexual Harassment Prevention Fact Sheet.  (*Id.* at 103.)  However, Plaintiff testified that there was no sexual harassment prevention training.  (*Id.* at 104.)

First Transit also has an EEO Policy, which states in part:

First Transit believes that the establishment of a dignified workplace provides the foundation for an environment free of discrimination and harassment. Harassment of any kind is illegal and prohibited as is the granting or denying of employment or advancement based on the demand for sexual favors. The Company will not tolerate such behavior and will

take immediate action to correct such inappropriate workplace behavior. First Transit will also ensure that others, including supervisor personnel, do not retaliate against individuals who come forward with harassment charges...If you have concerns or need assistance regarding our EEO or AAP philosophy and practice, you may contact Corporate Human Resources at (513) 684-8709.

Further, First Transit has a Harassment Free Workplace policy, which states in part:

We firmly believe that all of us must be able to work in an environment that is free of harassment and discrimination. There is "zero tolerance" for any form of harassment, and also unintentional and careless acts that may contribute to creating a hostile environment for some employees. For example, employees should not tell jokes or stories which are offensive or discriminatory as to race, gender, religion, or sexual orientation. Employees should not make offensive gestures of a sexual nature and should not make unwanted or otherwise inappropriate comments about the physical appearance of another person. Our workplace should be free of pictures, cartoons, or other illustrations that are sexually explicit or otherwise inappropriate. First Transit is a workplace that values individual contributions and professional growth which allows us to exceed our customer's expectations...Any employee who feels he or she is the victim of workplace harassment, or who witnesses unlawful harassment or abuse, whether from management, co-workers, or third parties, shall promptly report the matter to their immediate supervisor, location manager, Gayle Gray, Vice President Human Resources, First Transit at (513) 684-8709, or me (Michael C. Murray, President). All such reports shall be promptly and thoroughly investigated. No adverse action or retaliation will be taken or permitted against any employee who reports issues of workplace harassment.

(Ex. A-7 to Def.'s Mem.)  Plaintiff argues that this policy is irrelevant since it did not become effective until April 1, 2007, after Plaintiff had left First Transit's employment. However, Plaintiff admitted in her deposition that she was aware of First Transit's harassment policy and that this exhibit was similar to one she received.  (Ex. A to Def.'s Mem. at 102-03.)

Estrada initialed a form in May 2005 acknowledging that she received, read, and understood First Transit's Policy Statements concerning First Transit's EEO policy and Harassment Free Workplace policy. (Ex. A-8 to Def.'s Mem.) Plaintiff notes, however, that the EEO policy provided by First Transit was dated August 2005. (Ex. 3 to Pl.'s Resp.) Further, First Transit did not produce the Harassment Free Workplace policy dated May 2005. Plaintiff testified, however, that she did not have any reason to believe that she did not receive the May 2005 EEO and Harassment Free Workplace policies. (Ex. A to Def.'s Mem. at 107.) Plaintiff also testified that she was aware of the company's harassment policy.

On June 10, 2006, Estrada voluntarily resigned from her employment with First Transit. (Ex. A to Def.'s Mem. at 126.) On that day, Estrada drafted a resignation letter giving two weeks notice, handed it to Hyche, and said, "Here, I'm done." (*Id.* at 129.) Hyche made Estrada's resignation effective immediately, *i.e.*, the day she handed him the resignation letter. (*Id.*) Estrada testified that she did not care if the resignation was effective on June 10th or June 24th, as she no longer wanted to work at First Transit. (*Id.* at 148-49.)

In her resignation letter, Estrada stated the reason she quit was because she had not received a pay raise. The letter says that Plaintiff gave her all and got "nothing in return but broken promises." (Ex. A-9 to Def.'s Mem.) The resignation letter does not reference that Estrada was being gawked at or sexually harassed, or that Hyche was treating Estrada inappropriately.

B.     The Alleged Sexual Harassment by Hyche

During the first six to seven months of her employment at First Transit, while she was a dispatcher, Estrada testified that she suspected during that time frame that Hyche wanted to date her based on rumors from co-workers but that this was not confirmed until November 2005 when Hyche called her into his office and told her he wanted to date her.  (Ex. A to Def.'s Mem. at 75, 92-93.)  In response to a question about whether Estrada felt any pressure from Hyche during her first six to seven months of her employment, she testified that he still made comments during that period and felt some pressure but she did not believe that they were 100 percent focused on her.  (*Id.* at 93.)  This changed when he called her into his office in November 2005 and told her he wanted to date her.  (*Id.* at 75, 92-93.)

Plaintiff also testified in her deposition and in an affidavit attached to her response brief that Hyche called her into his office in late August or early September 2005 to tell her that he brought her to First Transit for all the wrong reasons and that he was sorry, and that he wanted to get to know her better.  (Ex. 1 to Pl.'s Resp. at 59-60, Ex. 9.) [2]  Indeed, Plaintiff learned of the employment opportunity at First Transit through Hyche.  (*Id.* at 23-24.)  According to the deposition of Asencion "Sonny" Gloria, Hyche told Estrada to put in an application at First Transit, and that Hyche told him that he was attracted to Estrada and wanted to date her.  (Ex. 4 to Pl.'s Resp.)[3]

---

[2]  I reject First Transit's argument that this affidavit testimony should be disregarded because it contradicts Plaintiff's deposition testimony.

[3]  I overrule First Transit's objections to many of Plaintiff's additional undisputed facts based on lack of foundation, hearsay, inadmissible opinion and/or that the facts are unsupported by the evidence.  I have, however, relied on the actual evidence in this case in stating the facts relevant to these paragraphs.

As to other alleged bad acts of Hyche, Estrada claims that while she was a scheduler, he would enter Estrada's window-less office, close the door and sit three feet behind Estrada for up to an hour a day. (Ex. 1 to Pl.'s Resp. at 84.) While locked in her office, Hyche would repeatedly ask Estrada to go out with him, commenting on how beautiful and sexy her lips were and requesting kisses and other physical favors. (*Id.* at 84-86.) Further, Hyche asked her, "do your lips feel as soft as they look?" (*Id.* at 85.) Estrada had a swivel chair in her office and he would say to her, "What would you do if I bent you over backwards and kissed you." (*Id.* at 84-85.) Estrada testified that she worried that the swivel chair would fall backwards and she would all into Hyche's lap. (*Id.* at 85.)

Hyche also told her not to worry about his sexual performance since he took Viagra and that would take care of her and her daughter financially if she would date him. (Ex. 1 to Pl.'s Resp. at 86; Ex. A to Def.'s Mem. at 220.) Further, he told her that he would pay for her to go to school. (Ex. 1 to Pl.'s Resp. at 86.) Hyche would ask her what it would take for him to win Estrada's heart and she would tell him to shut up. (*Id.* at 86.) Hyche would ask why she was so mean to him and Estrada would respond that this was her personal life and refer to her [physical] bubble around her. (*Id.*)

Also during this time frame, Plaintiff testified that Hyche exhibited jealousy towards other drivers. (Ex. A to Pl.'s Resp. at 255.) When she would talk to Keita Kollette, a driver, about his schedule, Hyche would run out of his office and punch Keita

---

As to Defendant's objections to certain paragraphs being mere conclusory allegations, I did not include those allegations that I felt were mere conclusions.

in the stomach.  (*Id.* at 255-56.)  Plaintiff worried that he might injure male employees due to his jealousy.  (*Id.*)  He also referred to Keita as Plaintiff's boyfriend, which was not true, and would call Estrada into his office asking why he should let her boyfriend stay employed.  (*Id.*)

Also while Estrada was a scheduler, Hyche called her during her off-work hours at night asking for romantic and sexual factors.  (Ex. 1 to Pl.'s Resp. at 86.)  Hyche would often call at 10:00 p.m.  (*Id.*)  In response to these calls, Estrada would tell him that she was not interested in him and that she emotionally surrounded herself with a brick wall.  (*Id.* at 86-87.)  Hyche would respond that he would remove that wall, one brick at a time.  (*Id.* at 87.)

Further, Hyche invited Estrada to go to Hawaii with him and she refused the offer.  (Ex. 1 to Pl.'s Resp. at 222-23.)  Hyche created a confirmation sheet on his computer for the vacation in Hawaii.  (*Id.* at 215.)  Estrada was afraid that he would confirm the trip and be mad that he wasted his money when she refused the trip.  (*Id.*)  Hyche did offer, however, to get Plaintiff her own room when he invited her to go to Hawaii, and told her that she was not expected to stay in his room.  (*Id.* at 223.)  Hyche also offered to fly Estrada to Las Vegas, as he had a pilot's license.  (*Id.* at 215.)  Plaintiff did not go to either Las Vegas or Hawaii.

Estrada testified that she was embarrassed and uncomfortable by Hyche's actions in her office, but was too scared to get up and just walk out of the office since she felt she needed her job.  (Ex. 1 to Pl.'s Resp. at 85.)  Co-worker Pat Thurston testified in his affidavit that he saw Plaintiff take maneuvers to avoid Hyche such as

taking her paperwork into the drivers' area to process.  (Ex. 5 to Pl.'s Resp.)  Estrada also testified that she was looked at as a piece of meat and was very embarrassed by Hyche's catcalls and behavior.  (Ex. 1 to Pl.'s Resp. at 372.)

After about three and a half months of Hyche's alleged inappropriate conduct, Estrada testified that she requested a reassignment to be away from the pressure from Hyche.  (Ex. 1 to Pl.'s Resp. at 58-59.)  She later testified, however, that she went to Hyche to ask for the reassignment because she could not take Roger Chapin anymore.  (Ex. 1 to Def. First Transit, Inc.'s Reply in Supp. of Mot. for Summ. J. ["Def.'s Reply"] at 415.)  Plaintiff was assigned the street supervisor position, which she asserts was a demotion as referenced previously.

As a street supervisor, Plaintiff would have to check in at First Transit headquarters every morning to obtain work for the day.  (Ex. 1 to Pl.'s Resp. at 69.)  Although she did not have to report to Hyche, she would often see Hyche then.  (*Id.*)  However, she tried to avoid that by getting in and out quickly.  (*Id.*)

After Estrada became a street supervisor, she asserts that Hyche increased his cell phone calls to Estrada, calling her every day.  (Ex. 1 to Pl.'s Resp. at 70-71, 81-82, Ex. 7.)  She asserts that while these calls would begin as work related, Hyche would, at some point during the calls, compliment her or ask her out for dinner.  (*Id.* at 82.)  Hyche would tell her that he was sorry and that he shouldn't be harassing her but then would compliment her or ask her out.  (*Id.* at 82-83, 386.)

Estrada also testified that a couple of times while walking upstairs to supervisor meetings, Hyche would tell her that she had a "really nice ass" and that she ought to

wear jeans more often. (Ex. 1 to Pl.'s Resp. at 221.) He also told her that she was gaining some weight and that her pants were awfully tight. (*Id.*) Plaintiff stopped wearing makeup in an attempt to be unattractive so that Hyche would not notice her. (*Id.* at 344-45.)

In December 2005, Estrada testified that Hyche asked her what she was going to buy her daughter for Christmas and she responded an X-box. (Ex. 1 to Pl.'s Resp. at 215.) Hyche bought the X-box at his own initiative, standing in line early in the morning. (*Id.* at 215-16.) Plaintiff told him she would pay him back. (*Id.* at 216.) He then refused to bring the X-box into work, despite Plaintiff having told her daughter she got her the X-box. (*Id.*) Plaintiff's daughter knew Hyche and Plaintiff put her on the cell phone with Hyche to ask him for the X-box. (*Id.*) Hyche told her she would not get her X-box because her mom would not meet him after work. (*Id.*) Estrada's daugther never got her X-box. (*Id.* at 217.) Estrada testified, however, that she did not view the X-box incident as sexual harassment. (*Id.* at 223.)

From December 22 to December 28, 2005, Hyche called Estrada 15 times. (Ex. 7 to Pl.'s Resp.) Plaintiff asserts that the calls related to the X-Box and his romantic intentions.

Plaintiff also asserts that Hyche attempted to win her affections by offering her numerous gifts and favors. For example, Hyche told Plaintiff at work one day that his nephew or cousin was getting rid of a microwave and television and asked her if she would like them. She stated that she would like to receive those items, and Hyche volunteered to deliver both the microwave and television set to Estrada on a Saturday.

He carried both items up three flights of stairs to her apartment and put them inside the apartment for her.  (Ex. 1 to Pl.'s Resp. at 153-54.)  Hyche also paid to have the brakes on Estrada's car fixed.  (*Id.* at 217.)  Estrada offered to reimburse him for this expense but he refused her offer.  (*Id.* at 217-18.)  Also, Estrada asked Hyche to borrow $60 so she could pay her gas bill, and Hyche gave her the money.  Estrada testified, however, that she did not have any problem asking Hyche for this money because he was a friend of hers.  (Ex. A to Def.'s Resp. at 303.)

Further, Plaintiff asserts that Hyche sent her two dozen roses/flowers and a teddy bear.  (Ex. A to Def.'s Mem. at 218, 411-12.)  While she initially thought they were from someone else, Hyche called and told Plaintiff in response to a question that he roses were from him.  (*Id.* at 218, 413.)  She also said that Hyche gave her a good schedule as a dispatcher and was always offering to buy her lunch.  (*Id.* at 76, 219.)

Plaintiff also alleged in her Amended Complaint that on one occasion when Estrada was eating a rolled taco, Hyche made a sexually explicit comment comparing a taco to a "banana" in a reference to a penis and oral sex.  (Am. Compl., ¶ 18.)  Although Plaintiff admitted in her deposition that she was not sure that Hyche made this comment (Ex. 1 to Pl.'s Resp. at 274-75), a co-worker, Pat Thurston, stated in an affidavit that Hyche made sexual comments that he wished he was the taquito that Estrada was eating and made sexual comments about the way Estrada ate a banana.  (Ex. 5 to Pl.'s Resp.)[4]

---

[4]  Again, I reject First Transit's argument that the affidavit should be rejected because it is self-serving and/or in conflict with Plaintiff's testimony.

In the Spring of 2006, Estrada asserts that Hyche would often call her late into the night to confirm that she was home alone and to ask her to give him a chance. Estrada made the decision to stop taking Hyche's calls.  (Ex. 1 to Pl.'s Resp. at 343-44.) She testified that he retaliated by making each supervisor return his calls within an hour or be written up.  (*Id.* at 344.)  Further, Estrada claims to have received phone calls for one week following her resignation and then changed her phone number.  (Ex. A to Def.'s Mem. at 167-68, 253-54.)  She is not sure who made those calls.  (*Id.* at 254.)

Estrada admitted, however, that Hyche did not attempt to grab her.  (Ex. A to Pl.'s Resp. at 209.)  Estrada also admitted that Hyche never tried to touch her (*id.* at 209), and that there was not any physical sexual contact between Estrada and Hyche. Finally, she admitted that Hyche never threatened her, either verbally or in writing.  (*Id.* at 210.)

Estrada stated in her affidavit that because of the continuous sexual harassment by Hyche, she became very reserved, quiet, anxious and developed low self-esteem and self-worth.  (Ex. 8 to Pl.'s Resp.).  During the Christmas holidays, she suffered anxiety and shame due to Hyche's excessive calls and attempts to date her.  (*Id.*)  She dreaded going to work, and there were times on her way to work where she would park and have an anxiety attack and cry uncontrollably.  (*Id.*; *see also* Ex. 9 to Pl.'s Resp. at 12.)  Unable to sleep, Estrada became fearful of her safety and believed she was being stalked by Hyche (Ex. 9 to Pl.'s Resp. at 47; Ex. 11 to Pl.'s Resp. at 29.)  She kept her drapes down in her apartment and was afraid to go outside.  (Ex. 9 at 48, 68.)

Estrada requested a day off on June 9 for a doctor's appointment. (Ex. 1 to Pl.'s Resp. at 126-27.) Despite Hyche's knowledge that Estrada was taking the day off for the appointment, she was called by dispatch to come back to work. (*Id.*) Plaintiff sent a text message to Hyche reminding him of her doctor appointment and tried to call him. (*Id.* at 127.) When she returned to work the next day, on June 10, 2006, Hyche asked Estrada where she had been the day before yesterday and denied that Plaintiff called him. (*Id.* at 128.) Plaintiff believed that Hyche had failed to inform Chapin of her doctor's appointment, that First Transit had marked her down as AWOL that day despite having made arrangements with Hyche for that appointment, and that she had nothing to look forward to on the following Monday since she was going to get in trouble with Chapin. (*Id.*) Plaintiff was upset with Hyche for not telling Chapin where she was, and decided at that time to resign. (*Id.* at 126, 129.)

Despite giving a two-week notice, Hyche decided to terminate her immediately. (*Id.* at 129.) Plaintiff asserts that this was because he viewed her termination as another rejection of his interest in Plaintiff.

### C. Estrada's Conduct in the WorkPlace and After Her Resignation

First Transit asserts that Estrada behaved inappropriately in the workplace. Estrada told her co-workers at First Transit that she was dating someone who used to be a professional stripper. Further, she hosted parties where sex toys were sold (both before and after her employment at First Transit), mentioned the first party to her coworkers and said she was going to have another one. (Ex. A to Def.'s Mem. at 289-90.) Estrada also showed her co-workers pictures of herself dressed in a genie

costume.  (*Id.* at 291-92, 298.)  In these pictures, Estrada was wearing a half-shirt and her midriff was exposed.  (*Id.* at 292.)  Estrada posted a couple of these pictures on her My Space website.  (*Id.* at 293.)  Additionally, these pictures showed off the breast enhancement surgery Estrada had undergone.  (*Id.* at 292.)  Estrada discussed her breast enhancement surgery in front of her co-workers, and Hyche was present during some of those conversation.  (*Id.* at 299.)  Finally, Estrada was married during her employment at First Transit but was separated from her husband.  Plaintiff told coworkers that both she and her husband were dating other people.  (*Id.* at 185.)

On July 28, 2006, a month and a half after she resigned from her employment at First Transit, Estrada filed a motion for a restraining order against Hyche.  When she filed the motion, she had not had any contact with Hyche since her resignation on or about June 12, 2006.  Further, Estrada could point to no evidence that would indicate Hyche had bothered or harassed her in any way since she left First Transit.

At the hearing, Estrada did not advise the Court that she had not seen Hyche since she left First Transit on June 12, 2006.  Estrada also did not advise the Court that she had not spoken with Hyche since she left First Transit a month and a half prior.  At the hearing on her motion for restraining order, Estrada dismissed her claims.  After that hearing, Hyche has had no contact with Estrada.

D.    Notice to First Transit of Hyche's Alleged Inappropriate Harassment

Estrada did not report Hyche's alleged inappropriate comments or behavior to Jackie Perez ["Perez"], First Transit's Human Resources' Manager for the Denver and Longmont facilities.  She also did not complain of Hyche's phone calls to Perez or any

other management level employee.  This is despite the fact that Plaintiff knew how to report a complaint at First Transit, as evidenced by her subsequent complaint against another First Transit employee.  She also did not report Hyche's alleged bad acts to his supervisor, Roger Chapin ["Chapin"], despite believing that he was very powerful and did not tolerate a lot.

Indeed, despite fully understanding how to report a complaint of sexual harassment at First Transit, Estrada did not make any such complaints, even as to Hyche.  Plaintiff did, in December 2005, go to Perez' office to complain about the facility's General Manager, Roger Chapin ["Chapin"]   At the time, Chapin was Hyche's supervisor.  Additionally, at the time she complained, Estrada believed that Chapin owned First Transit.  Perez asked Plaintiff to write a statement and said she would get back to Plaintiff.  (Ex. A to Def.'s Mem. at 64).  When Perez got back to Plaintiff, Estrada testified that Perez would not be taking care of this complaint because Chapin was her boss, but told Plaintiff that Chapin wanted to talk to her.  (*Id.*)  Perez offered to have Chapin talk to Plaintiff in her presence, and Plaintiff declined.  (*Id.*)

First Transit asserts from this, and Estrada admits, that she knew how the complaint process worked and knew that she was supposed to go to human resources to complain about harassment.  She also knew she could have complained to Perez or Chapin about Hyche yet chose not to do so.  In her deposition, Estrada testified: "I should have went to Roger and I didn't." (Ex. A to Def.'s Mem. at 212.)

Chapin did, however, call Hyche into his office at one point and ask if he was "sweet" on Estrada.  (Ex. 1 to Pl.'s Resp. at 425.)  While it appears that Hyche denied

this (Ex. 12 to Pl.'s Resp. at 109), Chapin did not report his suspicions to human resources or start an investigation.  First Transit asserts that Chapin would have had a duty to act in that circumstance only if Hyche confirmed it.  (Ex. 6 at 50-51.)  Human Resources Manager Perez also knew that Chapin had called Hyche into his office to ask him if he was "sweet" on Estrada.  (Ex. 12 to Pl.'s Resp. at 109.)  She also did not did not start an investigation into Hyche's conduct under First Transit's anti-sexual harassment policy.

Further, general manager Chapin knew that Hyche had locked door meetings in Estrada's office.  Plaintiff testified that Chapin had to knock on the door for Hyche to unlock it and let him in.  (Ex. 1 to Pl.'s Resp. at 85-86, 343.)  Chapin testified that it was not unusual for Hyche to have conversations that averaged about 45 minutes with his schedulers about what work is open, what actions created that work being open, what people were available and when they were available.  (Ex. C to Def.'s Reply at 60-61.)

III.    ANALYSIS

A.    Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing

summary judgment.'" *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Id.* (quotation omitted).

B.    Plaintiff's Sexual Harassment Claims

1.    Quid Pro Quo Harassment

In order to prove an actionable case of "*quid pro quo"* harassment, Estrada must demonstrate that her supervisor conditioned some tangible employment benefits, either expressly or impliedly, upon requested sexual conduct.  *Hicks v. Gates Rubber Co*, 833 F.2d 1406, 1413-14 (10th Cir. 1987); *see also Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994) ("Distilling the EEOC guidelines to their essence, we hold that quid pro quo sexual harassment occurs whenever an individual explicitly or implicitly conditions a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct").  Absent the possibility that adverse job consequences resulted from an employee's refusal to submit to sexual conduct, "there can be no legitimate claim of *quid pro quo* sexual harassment."  *Hicks,* 833 F.2d at 1413.

In this case, Hyche, as the alleged perpetrator of the sexual harassment, was Plaintiff's supervisor.  An employer is subject to vicarious liability to a victimized employee for sexual harassment when a supervisor with immediate (or successively higher) authority over the employee perpetrates the Title VII violation.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th

Cir. 2006).  According to the Tenth Circuit, an employer may refute a quid pro quo

harassment claim by either proving no negative employment action took place or

establishing it made the [adverse employment]  decision for legitimate business reasons

and not because the employee refused to submit to sexual demands." *Smith v.

Cashland*, 193 F.3d 1158, 1160 (10th Cir. 1999).

"'When a plaintiff proves that a tangible employment action resulted from a

refusal to submit to a supervisor's sexual demands, he or she establishes that the

employment decision itself constitutes a change in the terms and conditions of

employment that is actionable under Title VII.'" *Id.* (quoting *Burlington Indus., Inc. v.

Ellerth,* 524 U.S. 742, 118 S. Ct. 2257, 2265 (1998)).  In other words, no affirmative

defense is available to the employer when the supervisor's harassment culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. at 808.  As to that issue, the Court must determine whether "viewing

the evidence in the light most favorable to the plaintiff, no reasonable juror could

conclude that [plaintiff] had suffered a tangible employment action."  *Mallinson-

Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000).

"When no tangible employment action is taken, a defending employer may raise

an affirmative defense to liability or damages, subject to proof by a preponderance of

the evidence."  *Faragher*, 524 U.S. at 807.  "The defense comprises two necessary

elements: (1) that the employer exercised reasonable care to prevent and correct

promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise.  *Id.*  The employer "is entitled to judgment as a matter of law under the *Faragher/Burlington* affirmative defense 'only if the evidence points but one way and is susceptible to not reasonable inferences supporting' the opposing party."  *Pocrnick*, 224 F.3d at 12287 (quotation omitted).

In the present case, First Transit argues that Estrada is unable to show that she suffered a tangible employment action.  Further, it is argued that Plaintiff fails to show that Hyche conditioned any job consequence on her submission to his alleged advances.

I first address the merits of the quid pro quo harassment claim.  I  find that there is a genuine issue of material fact as to whether Hyche implicitly conditioned Plaintiff's employment on granting sexual favors to Hyche and/or whether any adverse job consequences Plaintiff suffered, *i.e.*, being given the street supervisor position and/or the change in her schedule from a set schedule to being a floater, were in response to her refusal to acquiesce in Hyche's requested sexual conduct.  The Ninth Circuit has noted that "difficult factual and legal questions will almost always arise whenever either the conditioning of benefits (or absence of detriment) or the request for favors is not explicit, but is instead implicit in the harasser's communications or dealings with his prey."  *Nichols*, 42 F.3d at 512.

As further explained in *Nichols*:

quid pro quo harassment is clear if a manager explicitly tells his subordinate "I will fire you unless you sleep with me."  However, it is much less clear whether a violation has occurred if a manager simply asks the subordinate whether she would like to have a drink after work to talk about a possible promotion and then sometime after she refuses, awards the position to another employee.  It is even less clear if the manager merely

invites the employee out for a drink on one or more occasions but does not suggest that he wishes to discuss work-related matters; if the manager is spurned and subsequently withholds anticipated benefits, it may set off alarm bells, but further evidence would be required before a charge of sexual harassment could be sustained.

*Id.* "Harassment in cases of implicit conditioning can be inferred only from the particular facts and circumstances of the case." *Id.* Implicit quid pro quo harassment "is far more likely to take place than is the explicit variety." *Id.*

Construing the evidence in the light most favorable to Plaintiff, Hyche told Plaintiff that he brought her over to First Transit because he wanted to date her. In other words, Hyche helped Estrada gain employment with First Transit with the express purpose of beginning a romantic relationship with her. He then proceeded almost daily to barrage Estrada with requests for dates both in the work place and in phone calls made to Estrada, and asked for kisses and sexual favors. Hyche told Plaintiff that he would take care of her sexually with the aid of Viagra and financially if she went out with him. Hyche also told Plaintiff he knew he should not be harassing her, but would then continue to ask her out and engage in other inappropriate conduct. When Plaintiff stopped taking his phone calls on her cell phone, Hyche scheduled a meeting stating that all his phone calls must be returned within the hour or written up. She further testified that she believed that her demotion to a street supervisor and her assignment to a floater with less desirable hours was in direct response to her attempt to rebut Hyche's advances.

While I recognize that Hyche never expressly conditioned Plaintiff's employment or terms thereof on granting sexual favors to him, I find from the foregoing that there is a

genuine issue of material fact about whether a reasonable woman in Estrada's position "would have believed that she was the subject of quid pro quo sexual harassment." *Nichols*, 42 F.3d at 512. I also find that there is a genuine issue of material fact as to whether Hyche actually intended to subject Plaintiff to quid pro quo sexual harassment under the subjective test articulated in *Nichols*. *Id.*

I now turn to First Transit's argument that Estrada cannot show that she suffered a tangible employment action. I find that there is a genuine issue of material fact as to whether Estrada suffered a tangible employment action in connection with Hyche's assignment of her to a street supervisor position in response to her request that Hyche remove her from scheduling. Viewing the evidence in the light most favorable to the Plaintiff, there is evidence in the form of testimony from Plaintiff's General Manager, Roger Chapin, that this job was a demotion. Further, there is evidence that Plaintiff was then assigned a floater position with a less desirable schedule and only one day off. Obviously, if the jury in this case determines that there was a tangible employment action, no affirmative defense is available to First Transit and it will be liable for any sexual harassment perpetrated by Hyche.

Finally, I note that even if the jury finds that there was not a tangible employment action, such that the *Faragher/Burlington* affirmative defense would be available to First Transit, I find that there is a genuine issue of material fact as to whether First Transit exercised reasonable care to prevent and correct promptly any sexually harassing behavior. Specifically, there is evidence that Chapin, the General Manager, knew or believed that Hyche might be "sweet" on Plaintiff. Human Resources Manager Perez

also knew that Chapin had called Hyche into his office to ask him if he was "sweet" on Estrada. This raises the issue of how Chapin acquired his knowledge. A reasonable jury could assume that Chapin acquired such knowledge through observing the very conduct of Hyche at issue. Indeed, there is evidence that Chapin knew that Hyche would go into Plaintiff's office and lock the door.

For the foregoing, I find that there are genuine issues of fact as to whether Chapin or Perez knew or should of known of the hostile work environment. Further, there are issues of fact as to whether Chapin and Perez failed to adequately respond. While Chapin called Hyche into his office and asked if Hyche was sweet on Plaintiff, he took Hyche at his word when he answered in the negative, did not interview Plaintiff or report Hyche's conduct, and did not take any preventive or corrective measures to stop Hyche's actions towards Plaintiff. Perez also did not do anything.

### 2. Hostile Work Environment

First Transit asserts that summary judgment is appropriate on this claim because the conduct about which Plaintiff complains was not severe or pervasive. I disagree, and believe that a reasonable jury could conclude that Plaintiff experienced a hostile work environment.

Turning to my analysis, sexual harassment so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment' violates Title VII. *Faragher,* 524 U.S. at 786. "[T]o be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

fact did perceive to be so." *Id.* at 787; *see also O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).  For a  hostile work environment sexual harassment claim to withstand judgment as a matter of law:

> a plaintiff must show that a rational jury could find that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.... While the plaintiff must show that the "environment would reasonably be perceived, and is perceived, as hostile or abusive," she need not show actual psychological injury.  Whether an environment is hostile or abusive "can be determined only by looking at all the circumstances ... [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

In the case at hand, as Plaintiff notes, this is not a case of isolated incidents over an extended term of employment, as in the cases cited by First Transit.  Instead, the evidence construed in the light most favorable to Plaintiff shows daily or almost daily inappropriate sexual conduct by Hyche towards Plaintiff over a period of several months which included repeated requests for dates, sexual innuendo and sexual compliments to Plaintiffs, sometimes in the presence of coworkers, and numerous calls to Plaintiffs' cell phone asking for dates.  Hyche made sexual comments to Estrada, such as wishing that he was the taquito that Estrada was eating and comments about the way Estrada ate a banana.  He also made comments about how beautiful and sexy Estrada's lips were, asked her if her lips felt as soft as they looked, and what she would do if he bent

over backwards and kissed her.  Further, he commented on Plaintiff's body,  told her that she had a "really nice ass", that she ought to wear jeans more often, and that she was gaining some weight and that her pants were awfully tight.  There is also evidence Hyche made catcalls in Plaintiff's and other coworkers' presence directed at Plaintiff and that he exhibited extreme jealousy towards certain male coworkers of Plaintiff.

The evidence also shows that while Estrada was a scheduler in First Transit's headquarters, Hyche would enter Estrada's office, close and lock the door, and sit directly behind her for up to an hour at a time making sexual comments, requesting dates and sexual favors, and threatening sexual contact.  Hyche told Plaintiff he would take care of her sexually with the aid of Viagra and financially if she would date him.  He also offered Plaintiff numerous gifts and favors at work in an effort to get her to date him and requested kisses and other sexual favors.  Based on the foregoing, I find that a rational jury could find that the work environment Plaintiff was subjected to is objectively hostile, *i.e.*, that Estrada's workplace was permeated with harassment so "severe or pervasive" as to  create an abusive working environment."  *Faragher,* 524 U.S. at 786.

There is also evidence that this hostile work environment altered the conditions of Plaintiff's employment.  Estrada testified that she asked for a reassignment because of this environment, in an effort to avoid Hyche at the office.  She further testified that when Hyche demoted her in response to this request, Hyche increased his phone calls to Plaintiff on her cell phone requesting romantic and sexual opportunities and changed Plaintiff from a set schedule to a floater which entailed her having to work an erratic and unpredictable work schedule and only have one day off.  Because of this, Plaintiff

testifies that she became extremely upset, was afraid to leave her home, suffered severe anxiety driving to work, and ultimately decided to submit her resignation letter.[5] Despite giving a two-week notice, Hyche decided to terminate her immediately. *See Davis*, 142 F.3d at 1341 (where Davis testified that the actions of a co-worker made her "more and more stressed out and pretty cracked," that she felt "[t]errible" and that she "hated" the behavior, was "pretty shocked," and that she "just wanted to avoid the whole situation", such testimony was sufficient to go to the jury on whether she subjectively perceived a hostile environment).

Finally, while there is some evidence of possible inappropriate behavior by Plaintiff in the workplace, I do not find that she engaged in the type of conduct about which she now complains or that her conduct vitiates her hostile work environment claim. Viewed in the light most favorable to Plaintiff, her behavior consists of mentions of breast augmentation surgery or a party where sex toys were sold, mainly made to female friends at work. I agree with Estrada that this does not amount to conduct that suggests that a supervisor's sexual advances would be appropriate and welcome.

First Transit also argues that there was no tangible employment action, and that it can establish the *Faragher/Burlington* affirmative defense. However, for the reasons discussed above in connection with the quid pro quo harassment claim, I find that there are genuine issues of material fact that preclude summary judgment on these issues.

---

[5] In fact, Plaintiff asserts that the harassment was so bad that she was, in essence, constructively discharged. While Plaintiff did not plead this claim in her complaint, I decline to grant summary judgment as to this claim at this time. I do not find that this claim was adequately briefed in connection with the summary judgment motion.

3.    <u>Outrageous Conduct</u>

The elements of outrageous conduct are:  1) the defendant engaged in extreme and outrageous conduct; 2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and 3) the defendant's conduct caused plaintiff to suffer severe emotional distress."  *McCarty v. Kaiser-Hill Co., L.L.C.*, 15 P.3d 1122, 1126 (Colo. App. 2000).  "The level of outrageousness required for conduct for create liability for intentional infliction of emotional distress is extremely high."  *Id.*

In this case, the claim of outrageous conduct is directed at First Transit, a corporation.  A corporate body may be liable for the infliction of emotional distress if its corporate supervisors and officials engage in conduct that rises to the level of reckless disregard of outrageous conduct.  *See Pollard v. E.I. Dupont De Nemours, Inc.*, 412 F.3d 657, 665 (6th Cir. 2005); *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 13 (10th Cir. 1990).  Corporations have been held liable for outrageous conduct when its supervisors/ managers make no effort to intervene or take action to stop harassment that is known to them.  *See Pollard*, 412 F.3d at 665 ("Supervisors and other management officials stood idly by as the harassment continued day after day, week after week, month after month").  The liability is not based on vicarious liability, but on "the entity's failure to act in the face of outrageous conduct by persons under its immediate control who are causing serious harm within the general scope of employment and within the knowledge of its officials."  *Id.*

In the case at hand, I find that summary judgment must also be denied on this claim. As stated previously, Plaintiff has presented evidence that the General Manager, Roger Chapin, called Hyche into his office to ask him whether he was "sweet" on Plaintiff. There is also evidence that Human Resources' Manager Perez knew about this. As explained above in connection with the sexual harassment claims, this raises an issue of fact about whether Chapin and/or Perez knew of the harassing behavior by Hyche and did nothing to stop it. Accordingly, I deny summary judgment as to this claim.

4.     Negligent Supervision

In order to prevail on a claim against an employer for negligent supervision of an employee, Plaintiff must show the following: 1) that First Transit had a duty to her; 2) that First Transit breached that duty; and that (3) First Transit's breach of that duty caused Plaintiff harm. *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005). With respect to the duty to her, Plaintiff "must prove that the employer ha[d] a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known the employee would cause harm." *Id.*

I find that summary judgment must also be denied as to this claim. Again I find that there are genuine issues of material fact as to whether Chapin and/or Perez knew of Hyche's harassment. If so, I believe that a reasonable jury could find that First Transit, through its managers, knew that Hyche posed an unreasonable risk of harm to Plaintiff. Accordingly, I deny summary judgment as to this claim as well.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment is **DENIED**.

Dated:  March 6, 2009

                                   BY THE COURT:


                                   s/ Wiley Y. Daniel
                                   Wiley Y. Daniel
                                   Chief United States District Judge